### SWIFT & COMPANY v. CALLAHAM

#### (131 S. E., 146)

1. Appeal and Error—Judgment, After Settling of Issues of Fact by Jury, Must Stand Unless There are Errors of Law in Submitting Issues.—Where jury has settled issues of fact and· new trial has been refused, Supreme Court cannot review facts, and judgment must stand unless there were errors of law in submitting issues to jury.

2. Evidence—Excluding Testimony Relating to Matters Occurring Between Agent and Principals to Which Plaintiff Was Not Party Held Proper.—In action on note given by agent of copartnership, excluding testimony relating to matters which occurred between parties themselves, and to which plaintiff was not a party, was proper.

3. Principal and Agent—Instruction as to Whether Agent Acted Within Apparent Scope of His Authority Proper, Where There Was Evidence as to Both Direct and Apparent Authority.—In action upon a note given by agent of copartnership, instruction that case depended on whether agent acted within scope or power of authority or apparent scope, *held* proper, where there was evidence as to both direct and apparent authority.

4. Appeal and Error—Instruction That Agency Could Not be Proved by What Agent Had Said Outside of Court Held Favorable to Principal.—In action upon note given by agent, instruction that jury could find agent's authority by what agent had said outside of Court *held* favorable to principals.

5. Principal and Agent—Instruction That Principal Would be Bound if He Knew That Agent Held Himself Out as Such Held Proper, Under Allegations.—In action upon note given by agent, instruction that principal would be bound if he knew that agent was holding himself out as such *held* proper, under allegations of complaint that principals made note through their agent and manager.

6. Principal and Agent—Instruction That All Acts Done Within Apparent Scope of Agent's Authority Were Binding on Principal Held Proper.—In action on note given by agent, instruction that all acts done within apparent scope of agent's authority were binding on principal was proper, where agent was in charge of principal's farm, managing it and conducting it, and buying things and settling for them.

7. PRINCIPAL AND AGENT—INSTRUCTION THAT IF AGENT ACTED SO THAT IT APPEARED THAT HE HAD AUTHORITY INSTRUCTIONS FROM PRINCIPAL WOULD NOT GOVERN, HELD PROPER.—In action on note given by agent, instruction that actual instructions from principal to agent did not govern if he acted in such way that it would appear to person of ordinary reason that he had authority *held* proper.

8. PRINCIPAL AND AGENT—INSTRUCTION THAT PRINCIPAL WAS ESTOPPED FROM DENYING AGENT'S AUTHORITY AFTER PLACING HIM IN SITUATION WHERE PERSON OF ORDINARY PRUDENCE WOULD PRESUME AGENT WAS AUTHORIZED HELD PROPER.—In action on note given by agent, instruction that principal was estopped from denying agent's authority when he had placed agent in situation that person of ordinary prudence would assume agent was authorized *held* proper, in view of evidence.

9. PRINCIPAL AND AGENT—EVIDENCE HELD SUFFICIENT TO SUPPORT INFERENCE THAT MANAGER OF FARM HAD AUTHORITY TO BIND OWNERS FOR FERTILIZER.—Evidence *held* sufficient to support inference that manager of farm had authority to bind owners for fertilizer used thereon, for which manager had given note.

10. PRINCIPAL AND AGENT—SELLER OF FERTILIZER TO FARM MANAGER NOT BOUND BY PRIVATE ARRANGEMENTS EXISTING BETWEEN MANAGER AND OWNERS.—Seller of fertilizer to manager of farm *held* not to have been bound by any private arrangements existing between owners of farm and manager, relative to manager's authority to give note for fertilizer in name of owners.

11. TRIAL—MODIFYING INSTRUCTION THAT AGENCY IS ORDINARILY A MATTER OF AUTHORITY TO CHARGE IT AS GENERAL PROPOSITION HELD NOT ERROR.—In action on note given by agent, modifying instruction that agency was ordinarily matter of authority, by adding that it was charged "as a general proposition," *held* not error, quoted words being merely surplusage.

12. TRIAL—COURT MAY MODIFY CHARGE WHERE MEANING IS NOT CHANGED.—Modification of charge as to apparent authority of agent *held* not error, as meaning was not changed.

13. TRIAL—QUALIFYING CHARGE TO SHOW THAT ANY ONE OF PARTNERSHIP COULD GIVE AGENT AUTORITY TO SIGN NOTE HELD PROPER.—In In action on note given by agent of copartnership, charging, in connection with requested instruction that plaintiff must prove that principals authorized agent to make note, that any one of partnership could give authority, *held* proper.

14. TRIAL—COURT MAY QUALIFY CHARGE BY ADDITIONAL EXPLANATION WHICH DOES NOT CONTRAVENE THAT ALREADY CHARGED.—Qualifying requested charge by making additional explanation, which in no way contravened what had already been charged, *held* not error.

15. Principal and Agent—Instruction That Unauthorized Act Would be Binding After Ratification Warranted by Evidence.— In ·action on note given by agent, instruction that, where person acted without authority and act was afterwards ratified, then act would be binding on principal, *held* warranted by evidence.

16. Evidence—Court Will Take Judicial Notice That in Order to Farm Profitably Fertilizers Must be Used.—Court will take judicial notice that in order to farm profitably fertilizers must be used.

17. Partnership—Instruction That Copartnership Would be Bound by Acts of Agent, if One Partner Knew What Agent Was Doing and Failed to Give Notice of Lack of Authority, Held Proper.—In action on note given by agent of copartnership, instruction that if one of copartnership knew what agent was doing and failed to give notice that he had no authority, then copartnership would be bound, *held* proper, notwithstanding that estoppel was not pleaded.

18. Partnership—Evidence Held to Show Relationship of Copartnership Between Manager of Farm and Owners.—In action on note given by manager of farm for fertilizer *held* that evidence showed copartnership between manager and owners.

Before Shipp, J., Spartanburg, January, 1924. Affirmed.

Action by Swift & Co. against C. K. Callaham and others. From a judgment for plaintiff, defendants appeal.

*Messrs. Brown & Boyd,* for appellants, cite: *Object of cross-examination :* 12 Cyc., 983. *Right of cross-examination:* 58 S. C., 70; 28 R. C. D., 600. *Proof of agency by declarations of agent:* 129 S. E., 213; 72 S. C., 251. *Implied authority of agent:* 108 S. C., 92. *Intention necessary to create agency·* 125 S. C., 466; 2 C. J., 434. *Duty to ascertain extent of agency:* 127 S. E., 564; 123 S. E., 848; 21 R. C. L., 808. *Color of agency:* 21 R. C. L., 856. *Ratification of agent's act:* 21 R. C. L., 928.

*Messrs. Perrin & Tinsley* and *Dean, Cothran & Wyche,* for respondent, cite: *Proof of agency by declarations of agent:* 113 S. C., 499. *Implied powers of agent:* 122 S. E., 669; 27 S. C., 132; 21 R. C. L., 854. *Agency a question of fact:* 114 S. C., 488.

January 11, 1926.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE R. O. PURDY.

This action was tried before his Honor, Judge Shipp, and a jury, in January, 1924, in Spartanburg County, resulting in a verdict for the plaintiff for the amount claimed. The action was upon a note, the making of which grew out of the following circumstances:

There was a large tract of land in Aiken County, referred to as the Windsor lands, and this was owned by a partnership, composed of four persons, Mr. Callaham, Mr. Potter, Mr. Wall, and Mr. Bryson; they traded as copartners under the name of Spartan Land & Lumber Company, and shipped lumber from Williston, a Mr. L. M. Pearson having charge of shipping the lumber, and Mr. Pearson also looked after the farming operations on the land. Mr. Pearson stated that Mr. Potter and Mr. Wall were the "leaders" who employed him.

They farmed the land in 1920. They also went into a farming arrangment for the year 1921. Mr. Pearson lived at Williston. Mr. Potter stated that Mr. Pearson was to take the place and pay each of his copartners one-fifth of the profits of the place after the crop was made and gathered, and he says there was no agreement as to extending credit, and says, "I think Mr. Pearson was supposed to finance it himself," and that he never gave Mr. Pearson authority to extend credit of the Spartan Land & Lumber Company or to sign notes for it, and that the first he heard of the note in question was in 1922.

So, likewise, Mr. Callaham stated that for the year 1921 nothing was discussed regarding credit, but the financing of the company that year was discussed. He stated that all four of them were present at the time that he had the conversation with Mr. Pearson in reference to his employment for that year, and that he never, then or at any time thereafter, either directly or indirectly gave Mr. Pearson any

authority to extend the credit of the company or to sign the note, but says that he received a letter from the plaintiff, to which he replied as follows:

"Spartanburg, S. C., January 27, 1921.

"Swift & Co., Atlanta, Ga. Gentlemen: I received your inquiry addressed to myself and Mr. Wall regarding the Spartan Land & Lumber Company. As far as credit information, I do not think that it would fair to you for me to fill out this blank, as Mr. Wall and myself own half interest in the Spartan Land & Lumber Company, W. B. Potter and W. L. Bryson owning the other half interest. For your information, this company is not incorporated, but party business between us four, not knowing exactly what the other three are worth, but I should think that a conservative estimate would be for the company around $150,000 to $200,000. You might try any of the banks here regarding the four.

"I do not know what your inquiry is for, but we have practically made up our minds not to use any commercial fertilizer this time, but are going to buy meal and acid; however, this information might do you some good for future references.

"Yours very truly,

"C. K. CALLAHAM."

Mr. Bryson testified that Mr. Pearson was to take the place and get one-fifth, or, as he expressed it:

"He was to work the place, rent it out and collect the rents, give us each one-fifth of the profits, and he was to get one-fifth. I never received my fifth. There was never after that any arrangement made, either directly or indirectly, authorizing Mr. Pearson to extend the credit of the company, or to make any note for the company. I never heard at all of his extending the company's credit in any way except this note. I first found out about this note some time in the fall after it became due. I never got any part of the cash for which the fertilizer was sold.

Pearson rendered a statement to me from down there, but it had no credit on it for fertilizer sold for cash."

He said, further, that he did not know whether any of the fertilizer was used on that farm or not, and that he had never had any inquiry from the plaintiff or any one else as to Mr. Pearson's authority to make the note; that they did not furnish any fertilizer for the crop, and did not buy any soda or meal, and added:

"We didn't have him as overseer or anything like that. He was just to get a part of the crop. He had charge of the farm for his own; he didn't farm for us. We got our part of it, or was to get our part. He was operating the farm for five of us, himself and we four."

Mr. Wall testified that he was not present when the first arrangement was made with Mr. Pearson. Speaking of a period later on, Mr. Wall said:

"He said he didn't have any money to run the farm, didn't have the money to run it like he started to run it; and made arrangements for him to make drafts for any money that he needed, not to have anything charged to us. I was to take care of the drafts. I went down there, sometimes in two weeks and sometimes it would be a month. He always made drafts for what money he needed. I told him not to buy nothing on credit. When we got the books audited I saw he had that note, that he had given a note. I saw that in that statement. That was after the note matured. The first I ever heard of any effort on his part to extend the credit of the company was somewhere around November, 1921."

The witness said further that in Mr. Pearson's office— it must have been about the 1st of February—Mr. Pearson said that he had bought some guano, stating that he had one car rolling, and witness thought he said that he had ordered out two more. Witness said to Mr. Pearson, "What are you going to do with all that guano?" and he said he was going to sell some and use some on his own

farm. "Q. Did he say anything about ordering it in your name? A. Not a word. I never asked him." He did not indicate then or at any other time other than that he was buying that fertilizer for himself. Witness stated that he had no idea it was being bought in the name of the defendants.

The agent for the fertilizer company was Mr. Martin, who was, at the time of the trial, out West, sick, and Mr. Wall stated that the subject of selling the fertilizer was never mentioned to him. He states that he was under no obligation to furnish fertilizer to Mr. Pearson. The witness reiterated the fact that Mr. Pearson was to run the farm for one-fifth of the profits, and he and his copartners were to get the other four-fifths, and the first trade made with Mr. Pearson was that he was to furnish all the money, but in the second trade he said he did not have any money, and was to make draft on witness every two weeks for the payrolls, which he did. There was a big loss at the end of the year. Witness said he never saw the contract, and was not present when Mr. Pearson ordered the fertilizer, adding:

"The first I knew of it he said he had a bill of lading for a car and had two more cars ordered, and I asked him what he was going to do with it. I never knew he bought it in the Spartan Land & Lumber Company's name. I don't know whether a sack of the fertilizer was used on the land of the Spartan Land & Lumber Company or not. I didn't see the brands or anything about it."

Witness stated the following to the plaintiff on November 28, 1921:

"All the guano we used on the place would amount to about half of this amount, and we have been trying to get the matter straightened out with Mr. Pearson."

He did not know how much was used, but there was some used on the farm. He said Pearson was to furnish all that stuff. Asked if he saw the bill of lading the day he

was in the office and was told that the car was rolling, he said: "I don't think so." He was not positive whether he saw it or not, but knew he didn't read it; didn't look at the book.

The plaintiff relies for the most part on the testimony of Mr. Pearson, who testified, in substance, that he owned a farm at Williston, about eight miles away. The fertilizer in question was shipped to Windsor. Each one had the bill of lading. A copy of the bill of lading was sent to each member of the Spartan Land & Lumber Company.

"All that was not sold or used went to my farm; some of it went direct from Windsor to my farm. I don't remember how much. They have a statement of it. We sold a little for cash. In other words, this note represents fertilizer that went to my farm and used by me in my farming operations, some of it, and fertilizer that was shipped to Spartan Land & Lumber Company and sold for cash, some of it, and fertilizer that was hauled from Windsor to the farm that belongs to these defendants. When I took charge of the farm they told me to buy what I needed, and Mr. Wall was there when the prices were made on the fertilizer, and he told me to get the best prices I could for what I needed. He told me when this fertilizer came in that they didn't have any money. I asked them if I could sell some of it and get some money to run the place on. They said all right, and gave me that authority."

Witness said he had never signed the name of Spartan Land & Lumber Company to any note except this one, but that he bought groceries and supplies in that name and paid the bills himself at the end of each month. He said that his arrangement was that he was to get one-fifth of the net profits for his services, and that seems to have been conceded.

We have not recited this testimony in detail for the purpose of attempting to pass upon it, but for the purpose of showing that there was a conflict of testimony as to whether

Mr. Pearson had authority to bind Spartan Land & Lumber Company. If he had authority to make the contract and that called for the making of the note in case credit was given, naturally that would be a part of the transaction.

Since the determining of the issues depended on settling questions of fact by the jury, and those questions of fact have been settled adversely to the defendants and a new trial has been refused, this Court cannot review the facts, and judgment must stand, unless there be errors of law in submitting the issues to the jury.

The exceptions offered in behalf of the defendants are 17 in number.

Exceptions 1 and 2 impute error in excluding testimony, viz., first a statement rendered defendants by the witness Pearson, showing a charge to defendants by Pearson of interest on the fertilizer account, and next in excluding the testimony of the witness Potter, that the defendants had a specific and definite rule forbidding any action involving any contractual relations other than on concurrence of all four of the defendants. This testimony was properly excluded. The statement and the testimony sought to be offered related in both instances to matters which occurred between the parties themselves, to which the plaintiff was not a party, and he could not be bound by it.

The third exception imputes error in telling the jury that the case depends on whether or not the alleged agent of the defendants acted within the scope or power of the authority conferred on him by the defendants, or whether he acted within the apparent scope of his authority, or, if he did not have authority to execute the note in question, was his act ratified by the defendants? There was evidence as to both direct and apparent authority.

The fourth exception alleges error in charging the jury, "You cannot find out what an agent's authority is by what the agent himself tells you. You

can take the testimony of the agent when he gets on the stand; what I mean is, you can't prove agency by what the supposed agent says outside of the Court"; the alleged error being that "such charge required the jury to consider the bare testimony of Pearson that he was agent and had authority to buy what he wanted and to obligate the company to pay for it, contrary to the law of agency and the rules of evidence." An examination of this charge will show that in this respect it was most favorable to the appellant, in that it was nothing more than telling the jury that the jury could not rely on the statement of Pearson alone that he was the agent. This is manifest by examining the charge.

The fifth exception imputes error in charging the jury as follows, "The agent does certain things, and the principal knows he is doing these things and is holding himself out as the agent of the principal, he does that now with the knowledge of the principal, the principal would be bound"; in that "such charge required the jury to consider as an issue a matter not made an issue by the pleadings or testimony, to wit, the agent's holding himself out as having authority with the principal's knowledge; and to speculate on this matter not supported in testimony." The language complained of is a proper charge, under the allegations of the complaint, which allegations are to the effect that the defendants made the note through their agent and manager, Pearson. The defendants could make Pearson their agent and manager by holding him out as such and permitting him to do acts in their behalf, as well as by giving him express authority, and this was the idea offered to the jury by his Honor's charge.

The sixth exception alleges error in charging that all acts done within the apparent scope of the agent's authority are binding on the principal, in that there was no evidence of any authority at all appearing to plaintiff or of any holding out whatever by the defendants of any authority of Pearson. Pearson was in charge of the

farm, managing it and conducting it, and, so far as the testimony shows, was buying things for the farm and settling for them, was employing labor and doing those things which the master usually does in his own behalf on the farm, and had not only apparent, but had from all the testimony actual, authority to do those acts; the limitation sought to be put upon him by defendants being that he had no right to contract for fertilizer.

The seventh exception alleges error in charging the jury, "Actual instructions from the principal to the agent do not govern if he acted in such way that it would have appeared to a person of ordinary reason that he had authority"; in that "an agent's authority is generally governed by actual authority granted, * * * and any exceptions thereto to avail a third party must be based on the action of the principal and not on action of the agent alone," and that such instructions required the jury to attach responsibility of the principal on acts and statements of the agent alone, "contrary to the law that the burden is on a third party to show agent's authority such charge placed on the principal erroneously the burden of notifying third parties that the agent did not have authority to act for him." The request as submitted was not charged, but was modified in the particulars complained of, and, in so doing, his Honor correctly charged the law.

The eighth exception imputes error in charging the jury that, "Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act, and such principal act has been performed, the principal is estopped from denying the agent's authority to perform it"; in that such charge "presupposed evidence that plaintiff acted on some observation of some authorized act of the agent, while such was entirely lacking in plead-

ing and evidence." The jury evidently believed the testimony of Pearson to the effect that Wall, one of the defendants, was present when prices were made on the fertilizer, and he was told to get the best prices he could for what was needed.

The ninth exception imputes error in submitting the question of apparent authority to the jury, similar in import to the errors alleged in the third exception, and so, likewise, error is imputed in the tenth exception to the charge of his Honor that:

"Where a general manager or manager of a concern is placed in complete charge of the operations of the company's business and whose authority was apparently unlimited in the conduct of the business, the manager's authority was sufficient to justify an inference that he had authority to make a contract and to bind his principal thereto."

The evidence is ample to support the inference that Pearson had authority to bind the defendants. The testimony of the defendants is, not that he did not have authority to manage and operate the place, but that he must not contract debts in doing so, and the evidence is that he contracted debts and then drew on the defendants to pay them. The plaintiff was not bound by any private arrangements that existed between the defendants and Pearson, or, as is alleged in refusing the defendants' request for peremptory instruction, by the defendants' last request, that there is no evidence of any apparent authority in the case to make the note sued on. This is disposed of by what is said with reference to the third exception.

The twelfth exception alleges error in qualifying the defendant's first request, as follows: "Agency is ordinarily a matter of authority actually conferred on one person to do something for another, and is ordinarily limited to the specific authority given." This was modified to this extent: "I charge you that as a general proposition." We see no ground of or error in this. Had his Honor

simply said, "I charge you that," the charge would have been complete. Adding the words, "as a general proposition," is not different from saying that agency "is ordinarily a matter of authority." So, "as a general proposition," added by his Honor, is mere suplusage.

The thirteenth exception imputes error in qualifying defendant's second request, as follows:

"Agency may also extend to the apparent scope of the agent's authority, binding the principal to what acts the agent appears to have authoity to do, but a principal is only chargeable with acts of agent, done without authority, and within apparent authority, when the third party acts on the appearances, or apparent authority."

His Honor modified this by saying:

"Of course, Mr. Foreman, a person couldn't be bound if he didn't act on apperances; why, then, that wouldn't apply. One cannot charge another with merely apparent authority of an agent unless he has acted and been led to act on the authority the agent appeared to have."

The language used by his Honor is practically an assent to the proposition submitted. He was not obliged to charge in the very language submitted, and, although a correct proposition of law, the language used by his Honor did not change its meaning.

The fourteenth exception imputes error in qualifying defendants' sixth request:

"Unless the plaintiff proves to you by the greater weight of the evidence that these defendants authorized Pearson to make the note sued on, then your verdict must be for the defendants."

Modified by his Honor as follows:

"Well, I charge you that, Mr. Foreman, in connection with what I have already said. Where several persons are in a partnership, one of the tests of a partnership is that when men go into a partnership, form a partnership to run a business, one of the main ways in which you find whether

a partnership exists is that persons who are members of the firm have mutual authority to act as agent for the others. That is one of the tests of partnership. It is not necessary now in order to bind the partnership for every member of the firm to give an agent authority. If one member of the firm extends the authority, why he is acting within the scope of the partnership business,"

—the alleged error being "that such request contained a sound proposition of law, which defendants were entitled to have declared to the jury." His Honor submitted the request as charged, and even if he had not said that he charged this in connection with what he had already said, the jury would have been compelled to have so taken it, and his Honor, by the remarks which followed it, clearly declared the law.

Error is imputed in qualifying the seventh request of the defendant to the effect that the plaintiff cannot recover on the note unless they show to the satisfaction of the jury that Pearson had authority to sign the names of the defendants to the note, regardless of whether any of the fertilizer was used on other lands. His Honor said, "I charge you that," and, while he made an additional explanation, it in no way contravened what he had already charged.

The sixteenth exception imputes error in charging the jury that, where a person acts without authority, having no authority to the act, and it was afterwards found out and approved and ratified, that then the act of the agent would be binding on the principal notwithstanding the fact that he acted without authority in the beginning. There is ample evidence, if believed, showing ratification on the part of the defendants. Take for instance the testimony of Pearson, who stated that the fertilizer was shipped to Windsor; each one had a bill of lading; a copy of the bill of lading was sent to each member of the Spartan Land & Lumber Company. Pearson said when the fertilizer came

they did not have any money, and he asked if he could sell some of it to run the place, and was told he could do so. Besides, the testimony shows that Pearson told one or more of the defendants early in February that he had bought some guano, stating that he had one car rolling and had ordered two more out, and one of the defendants asked Pearson, "What are you going to do with all that guano?" and he said he was going to sell some and use some on his own farm.

It is a fact so well known that the Court will take judicial notice of it that in order to farm profitably fertilizers must be used. In the letter of January 27, 1921, written by Mr. Callaham, one of the defendants, he says to the plaintiff:

"I do not know what your inquiry is for, but we have practically made up our minds not to use any commercial fertilizer this time, but are going to buy meal and acid."

The testimony is that they did not buy any fertilizer of any kind, and hence they must have known that the fertilizer that was "rolling" in February, and that which was to follow, was fertilizer to be used on the farm. They say they did not inquire. Facts were brought to their attention which were equivalent to notice, and they are chargeable with notice of the fact that Pearson was getting fertilizer for the farm.

The seventeenth exception imputes error in charging on estoppel to the effect that it was for the jury to say whether either one of the defendants was present at the time that the trade for the fertilizer was made, and in charging the jury that if such a one knew what was going on and failed to give notice that Pearson had no authority, then the defendants would be bound. It is claimed that this is error because there is no foundation in the pleadings or the testimony by which to hold the defendants liable by estoppel, and that the definition and illustration were erroneous in not going further and showing that, in order to constitute estoppel, the defendants must have had full knowl-

edge, and it suggested to the jury as a fact that "what was going on" in the presence of one of the defendants at some time made it the duty of the defendants to give notice that Pearson had no authority, and that such facts would make the defendants liable on the note, unless they had then notified the plaintiff that they would not be liable.

The plaintiff did not have to plead estoppel. Pearson said that the defendant Wall told him to get the best prices he could for the fertilizer needed, and that when the fertilizer came in, they didn't have any money and he was authorized to sell a part of it. The doctrine that a principal is bound by the acts of his agent, acting within the scope of his actual or apparent authority, is succinctly illustrated in the case of *Thompson v. Shaw Motor Co.,* 128 S. C., 171; 122 S. E., 669. The law of principal and agent is so well understood, and has been so clearly illustrated by his Honor in his charge, that we have not incumbered this opinion with authorities. It is to be regretted that it has been necessary to extend the opinion to so great a length.

We will add in conclusion that, while not urged before the Court, the test of a copartnership between Pearson and the four defendants is so well met by the testimony as to their relationship that his act in purchasing the fertilizer could be sustained on that ground. Take the cross-examination of Mr. Bryson, one of the defendants:

"Mr. Pearson just operated this farm for himself. We just furnished him with the mules. We didn't furnish any fertilizer for the crop. We didn't buy any soda or meal. He was just to get a part of the crop. We didn't have him as overseer or anything like that. He was just to get a part of the crop. He had charge of the farm for his own. He didn't for us. We got our part of it, or was to get our part. He was operating the farm for the five of us, himself and we four."

If any profit had been made, it was to have been divided

into five parts, and if this was not a partnership, it is so near kin to it, as will be gathered from the testimony as related, that the Court might well come to the conclusion that the defendants ought to be bound by this contract, independently of the other facts which would bind them.

Besides all of this, the jury having related before them the fact that the defendants had agreed to permit Pearson to make drafts for the money he needed, and that he had in part relieved the defendants from paying out money by selling fertilizer for cash and expending it on the farm, they may have concluded and ought to have concluded that it was only fair that the defendants should be made to pay for the fertilizer and let Pearson and the defendants settle among themselves the question as to how much he used on his own farm.

The judgment is affirmed.

MESSRS. JUSTICES WATTS, COTHRAN and MARION concur.

MR. CHIEF JUSTICE GARY did not participate.